AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CYNTHIA SONG,<br>  aka "Iris Song,"<br>  aka "Xin Wang,"<br><br>Defendant(s) | Case No.   2:24-mj-06544-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT

October 27, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CLD_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the date(s) of August 1, 2023 through February 6, 2024, in the counties of Los Angeles

Riverside, and San Bernardino, in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jiongwei Cassidy Liu*
_____
*Complainant's signature*

Jiongwei Cassidy Liu, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 27, 2024

*Judge's signature*

City and state:   Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA Andrew M. Roach (213-894-0306)

**AFFIDAVIT**

I, Jiongwei Cassidy Liu, being duly sworn, declare and state as follows:

## I.  BACKGROUND OF AFFIANT

1.   I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since July 2022.  From September 2022 to March 2023, I received training at the Federal Law Enforcement Training Center.  This training included courses on conducting criminal investigations, narcotics identification, organized crime, gangs, fraud, counterfeiting, and other law enforcement topics.  I have conducted multiple criminal investigations for violations of federal and state laws including, but not limited to fraud, narcotics, money laundering, trafficking, identity theft, and human trafficking and smuggling.

## II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a complaint and arrest warrant for CYNTHIA SONG, aka "Iris Song," aka "Xin Wang," ("SONG") for a violation 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering).

3.   This affidavit is also made in support of an application for a warrant to search three digital devices (collectively, the "SUBJECT DEVICES") seized by HSI on October 25, 2024 at the time of SONG's arrest, as described more fully in Attachment A:

a.   A rose gold iPhone with black and white Christian Dior phone case ("SUBJECT DEVICE 1");

b.   A black iPhone with no case ("SUBJECT DEVICE 2"); and

c.   A blue Samsung Galaxy Flip ("SUBJECT DEVICE 3").

4.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Wire and Mail Fraud), and 18 U.S.C. § 1028A (Aggravated Identity Theft) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    HSI, U.S. Secret Service ("USSS"), and IRS Criminal Investigation ("IRS-CI") are jointly investigating SONG for suspected money laundering of the proceeds of various fraud schemes targeting  elderly victims.  Specifically, the investigation revealed that SONG created multiple corporate entities and opened multiple bank accounts that were used to receive proceeds of suspected frauds targeting elderly victims online and also recruited co-conspirators, including the three co-conspirators discussed

below, to similarly create corporate entities and open multiple bank accounts that have received a combined total of more than $2.5 million in funds believed to be the proceeds of fraud against elderly victims across the country.

7.    The investigation began after a victim in New York, Victim L.D., reported to the New York Police Department ("NYPD") that he had been defrauded of approximately $450,000 via an online scam. The investigating NYPD detective identified a bank account that received some of the funds stolen from Victim L.D. as belonging to Co-Conspirator 1 ("CC1"), a person residing in the Central District of California.

8.    As the investigation continued, the NYPD detective learned of a separate Sacramento Police Department investigation into CC1 involving similar scams targeting elderly victims online with the proceeds of the fraud being deposited into CC1's accounts. Ultimately, that investigation led to CC1's arrest by Sacramento Police in February 2024.  Law enforcement searched CC1's phones pursuant to a search warrant and found numerous messages between CC1 and an individual believed to be SONG about the transfer of fraud proceeds.  In addition, review of bank records for accounts that CC1 created to receive fraudulent funds showed that an IP address assigned to SONG in Arcadia, California had accessed CC1's accounts during the time when the accounts received suspected fraud proceeds. During a later interview with law enforcement, CC1 identified SONG by photograph and told law enforcement that she was the person who recruited him and provided directions regarding the transfer of suspected fraud proceeds.

9.    Further investigation of SONG revealed that she created multiple corporate entities and opened multiple bank accounts for those entities as early as 2021.  Those accounts received multiple wire transfers from reported fraud victims.

10.    SONG also engaged in money laundering with Co-Conspirator 2 ("CC2") and Co-Conspirator 3 ("CC3").  CC2 and CC3 were arrested in May 2024 after being indicted in the Central District of California for a separate conspiracy to traffic in counterfeit electronics.  Evidence gathered in the investigation of CC2 and CC3 showed that at SONG's direction, both CC2 and CC3 created business entities and opened bank accounts that later received a combined total of approximately $2 million of fraud proceeds from multiple elderly victims across the country.  The investigation showed that CC2 and CC3 used multiple addresses in Los Angeles County associated with SONG to open those business entities and bank accounts.  Bank surveillance video also showed SONG and CC2 arrive at a bank together to open one such bank account that later received fraudulent funds.  Bank records also indicated that after receiving suspected fraud proceeds, those funds were wired to NSMG Capital in Hong Kong, China, an entity associated with SONG.

11.    CC2's and CC3's cellphones were searched pursuant to a federal search warrant as part of the separate investigation into the counterfeit electronics trafficking conspiracy.  The search of their cellphones revealed multiple messages exchanged between CC2 and CC3 and an individual believed to be SONG regarding the transfer of fraud proceeds, in addition to messages between CC2 and CC3 in which they discussed transferring money and opening bank accounts.

12.   Law enforcement interviewed CC3 in both May and October 2024 as part of the investigation into the counterfeit electronic trafficking conspiracy.  During that interview, CC3 identified a person he knew as "Iris," an alias of SONG, as the person who recruited him to open business entities, bank accounts, and ultimately transfer proceeds of suspected fraud.  CC3 also indicated that the person he knew as "Iris," also used the name "Cynthia."

13.   Sometime around or after noon on Friday, October 25, 2024, SONG crossed the U.S.-Mexico border into the United States.  At the time, she was driving alone in a 2024 blue Mercedes GLE53 AMG coupe with California license plates.  A short while later, at approximately 2:06 p.m., SONG was stopped for secondary inspection at the U.S. Border Patrol checkpoint in Westmoreland, California. By this time she had two additional passengers in her car.  She was detained at that time and later placed under arrest based on the ongoing investigation and the facts below demonstrating probable cause that SONG is part of a money laundering conspiracy.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.   Based on my training and experience, my conversations with other law enforcement officers, my review of records, and my knowledge of this investigation, there is probable cause that SONG has engaged in money laundering and recruited multiple co-conspirators, including the three co-conspirators listed below, to engage in the laundering of fraud proceeds derived from elderly victims in various forms of online scams.

A.   Multiple Victims Report Losing Money in Online Scams With
     the Fraudulent Funds Going to Accounts Connected to CC1

15.   Law enforcement began investigating the case after
multiple fraud victims identified the bank accounts belonging to CC1
and entities that he created as the destination of fraud proceeds,
as explained below.

*Victim L.D. in New York Sends Money to CC1's Account*

16.   On October 24, 2023, NYPD detective Emilio Gomez
interviewed Victim L.D. at his Harlem restaurant in New York, New
York, regarding an online scam that targeted Victim L.D.  Below is a
summary of what Victim L.D. reported to the detective:

        a.   While browsing a website that appeared to belong to
Amazon to make a return, Victim L.D. called a telephone number
displayed on the website, at which point he spoke with someone who
identified himself as "Jason."

        b.   At some point in the conversation, Victim L.D.
followed Jason's instructions and provided Jason access to his
computer.  After taking control of Victim L.D.'s screen, Jason told
Victim L.D. that he had mistakenly been sent a large refund and
Victim L.D. needed to return the unearned funds.

        c.   Over a period of several weeks, Jason repeatedly
alerted Victim L.D. that Amazon had mistakenly sent funds to Victim
L.D.'s J.P. Morgan Chase ("Chase") checking account, and that Victim
L.D. needed to return those funds to Amazon.  On each occasion,
Victim L.D. sent the money in accordance with Jason's instructions.
In total, victim L.D. transferred more than $350,000 to Jason in
this manner.

d.    On another occasion, Jason directed Victim L.D. to get a check for $100,000 made payable to Carson International LLC. Victim L.D. complied with this request and then followed Jason's directions and deposited the $100,000 cashier's check into a Bank of America account for Carson International LLC on September 12, 2023.

e.    Later, Victim L.D. examined the statements from his bank accounts.  Upon reviewing his bank statements, Victim L.D. discovered that Jason had accessed his Chase bank account without his permission or authority and moved funds from Victim L.D.'s savings account to his checking account, and then deceived Victim L.D. into believing that the money in his checking account was the product of a mistaken Amazon refund.  This caused Victim L.D. to send funds to Jason under the fraudulently induced impression that Amazon had erroneously refunded him money.

f.    Victim L.D. reported losses of approximately $450,000 based on this scam.

17.    Detective Gomez later received records from Bank of America for the Carson International LLC account, which received the $100,000 cashier's check from Victim L.D.  Those records showed that the account, Bank of America account ending in 2820 ("BofA Account ending in 2820"), listed CC1 as the signatory on the account, and provided CC1's accurate biographical information, including a date of birth which corresponds to CC1's date of birth on CC1's California driver's license.

*SPD Identifies Other Victims Who Sent Money to Another Account Connected to CC1*

18.    Detective Gomez learned that the Sacramento Police Department ("SPD") was also investigating CC1 in connection with a similar scheme involving other victims.

19.  During SPD's investigation into CC1, an SPD detective identified a different bank account that also received multiple suspicious payments that were believed to be from online scams of elderly people.  This SPD detective later obtained bank records for this bank account, Bank of America account ending in 2826 ("BofA Account 2826").  Those records showed that the BofA Account 2826 was held in the name of Sunton International Trade LLC, and the only authorized signer on the account was CC1, who was listed as manager. The account records also showed that the account was opened on August 25, 2023, in Eastvale, California, a city in Riverside County, California.

20.  Through review of records from BofA Account 2826 and interviews with potential victims, SPD determined that CC1's account received approximately $423,700.38 in funds sent from victims located in California, Massachusetts, New York, Maine, Arizona, and Washington, including those listed below, all of whom were fraudulently deceived into sending money to BofA Account 2826.  The victims who sent money to BofA Account 2826 included:

    a.  Victims J.L. and M.L. (83 and 75 years old, respectively) who filed a police report with SPD on September 2023, reporting a total loss of approximately $160,000.  Victims J.L. and M.L. stated that they mailed approximately $50,000 in cash to Virginia and deposited two cashier's checks ($50,000 and $60,000) into BofA Account 2826 after they were called by someone claiming to be a law enforcement officer.

    b.  Victim M.L. (86 years old) who was discovered to be a potential victim based on records from BofA Account 2826.  Victim M.L. was interviewed and told law enforcement that she was scammed

into depositing a $48,000 cashier's check into BofA Account 2826 on September 7, 2023, after she was contacted by someone pretending to be a representative from Rockland Trust Bank (her bank).

       c. Victim C.H. (76 years old) who told SPD she had been the victim of a scam. Specifically, she said that she was deceived by someone who called claiming to be from the United States Social Security Administration. Victim C.H. stated that on September 29, 2023, she made a wire transfer of $86,200.38 to Sunton International Trade, LLC's bank account, BofA Account 2826.

       d. Victim C.M. (64 years old) also reported being a scam victim. He told the SPD detective that he had been a victim of cyber-attack during which a pop-up appeared on his screen and he called and spoke with someone who purported to be from Microsoft. The individual then directed Victim C.M. to log into his bank website from which the individual was able to obtain Victim C.M.'s bank login information. Victim C.M. was then directed by the fraudster to send a wire transfer of $49,000 to Sunton International Trade, LLC's bank account, BofA Account 2826, on October 6, 2023.

       e. Victims J.A. and B.A (88 and 65 years old, respectively) who told the SPD detective that they were prompted to call a number purported to be Microsoft support after a pop-up appeared on their computer. They were then directed to speak with someone who pretended to be with "Chase Fraud Department," who told Victim B.A. that she would need to wire money to a "protected" account. Following the guidance of the fraudster, victim B.A. sent a wire transfer of $46,000 to Sunton International Trade, LLC's bank account, BofA Account 2826, on October 10, 2023.

   f. Victim S.B. (77 years old) who was also identified as a potential victim based on a review of records from the BofA Account 2826. The SPD detective attempted to contact Victim S.B. to interview her, but the victim did not believe that the detective was a law enforcement officer due to her past interaction with the phone scammer. Victim S.B. stated she did not want to be included as a victim, because her bank (Umpqua Bank) closed her accounts without her permission after the suspected fraud was discovered and even though she had been banking with them for several decades. She declined to be considered a victim in the SPD investigation because she did not know how being included as a victim would affect her ability to open a new account at a different financial institution.[1]

  B. <u>IP Address Logs Show SONG Accessing CC1's Bank Accounts Where the Fraud Proceeds Were Deposited</u>

  21. Bank of America produced IP logs showing access to BofA Account 2826, the account belonging to Sunton International Trade LLC. Those logs showed approximately 48 IP addresses that were used to access BofA Account 2826 online.

  22. The SPD detective conducted further analysis of the IP addresses used to access BofA Account 2826 in the hopes of finding who controlled that account. Based on his review of the approximately 48 IP addresses, he found that 42 IP addresses resolved to T-Mobile, which was unable to provide subscriber

---

[1] Based on my training and experience, as well as talking with other agents who interview these types of victims, some of the victims decline to classify themselves as victims due to embarrassment or, worse yet, are in denial that they had been defrauded.

information; three IP addresses resolved to Charter Communications;
and two IP addresses resolved to AT&T Mobility.

23.  The SPD received records from Charter Communications for
the three IP addresses that accessed BofA Account 2826.  Two of the
IP addresses that accessed the account, specifically 172.118.177.153
and 104.33.72.159, were subscribed to SONG.  Specifically,
172.118.177.153 was subscribed to SONG at 121 W. Floral Avenue,
Arcadia, CA 91006, and with a phone number of ending in 8889, and
104.33.72.159 was subscribed to SONG at 923 Fairview Ave, Apt A,
Arcadia, CA 91007.

24.  A review of SONG's California driver's license listed her
address as 121 W. Floral Avenue, Arcadia, CA 91006.

C.    Bank Records Show Additional Entities and Bank Accounts
      Associated with CC1

25.  Review of the California Secretary of State website showed
that between August and November 2023, CC1 created the following
entities: Carson International LLC, Sunton International Trade LLC,
and Hotyin Real Estate LLC.  CC1 was listed as the agent for all of
the entities.

26.  CC1 then used each of these entities to open the following
bank accounts:

        i.    BofA Account 2820 which was associated with
Carlson International LLC as discussed above;

        ii.   BofA Account 2826 which was associated with
Sunton International Trade LLC as discussed above;

        iii.  An account at JP Morgan Chase Bank, N.A. in the
name of Carson International LLC, with account number ending in
0057;

iv.   An account at PNC Bank in the name of Hotyin
Real Estate LLC, with account number ending in 3906;

v.   An account at Citibank in the name of Carson
International LLC, with account number ending in 3193;

vi.   An account at Citibank in the name of Carson
International LLC, with account number ending in 7801; and

vii. An account at East West Bank in the name of
Hotyin Real Estate LLC, with account number ending in 1824.

27.  CC1 was listed as the signatory on all of these accounts.

28.  Based on my training and experience, the creation of
multiple entities and bank accounts in quick succession with no
apparent business purpose is likely an attempt to launder fraud
proceeds because money launderers routinely use multiple corporate
bank accounts in an attempt to conceal and hide proceeds of fraud.
CC1's opening and use of these accounts is consistent with that
practice.

D.   CC1 is Arrested, Interviewed, and Admitted He Received
     Directions Regarding Funds from SONG

29.  On February 6, 2024, the Ontario Police Department
arrested CC1 on a California state arrest warrant issued in
Sacramento County relating to the SPD investigation.  At the time of
his arrest, law enforcement seized from CC1 two cellphones and ten
bank cards, including ATM cards for the accounts discussed above.
The SPD later received a state search warrant to search CC1's two
cellphones.

30.  On March 15, 2024, CC1 was interviewed by law enforcement
in the presence of his defense counsel, law enforcement, and a

Mandarin Chinese translator.[2]  The interview was conducted in Mandarin Chinese and recorded.  During the interview, CC1 stated the following:

　　　　a.    CC1 was introduced to a Chinese woman he referred to and addressed as "elder sister" by another friend.  According to CC1, this woman asked CC1 to help with opening bank accounts at multiple banks including Wells Fargo, U.S. Bank, East West Bank, and Cathay Bank, which CC1 obliged.

　　　　b.    CC1 reported that the woman also set up three companies in CC1's name and helped him file corporate documents for these companies.  CC1 stated that she had access to his business bank accounts but she did not have authority to make withdrawals.

　　　　c.    CC1 reported his process of moving money as follows: Once the bank accounts and businesses were set up, CC1 followed the woman's directions to transfer money into and out of the bank accounts.  According to CC1, the woman also occasionally asked CC1 to make cash withdrawals and then would meet with him to retrieve the cash.  In return for his services, CC1 was paid between approximately $1,000 to $1,500 per transaction.

　　　　d.    CC1 reported that during one visit to a bank, the bank told him that they didn't believe the money in his account was clean, i.e., legitimate.  CC1 reported that he raised this concern with the woman he knew as "elder sister," but she assured him that

_____

　　　[2] CC1 has been in custody since his arrest in February 2024. CC1 sat for a proffer with the government to cooperate and in the hopes of leniency on his state charges and potential federal charges.  CC1 later signed a plea agreement in Central District of California relating to federal charges arising from this same conduct.

the money was clean and that the bank was just being strict, according to CC1.

e.   CC1 reported that he transferred money to companies and accounts in Hong Kong based on instructions from the woman. According to CC1, the woman provided him with the company names and account numbers for the financial transfers via electronic messages. The woman, however, never told CC1 what these Hong Kong businesses did or why money was being sent there.  CC1 also stated that the woman never went inside a bank with him when he made transactions in person, rather the woman would wait outside in the parking lot.  CC1 described CC1's car as a black Land Rover.

i.   According to California DMV records, SONG was the registered owner of a black Land Rover with California license plate 9DJH205.

f.   CC1 reported that the woman once texted him a photo of a person's identification while CC1 was at a bank conducting a transaction at her request.

g.   CC1 stated that at the time of his arrest he was on his way to U.S. Bank to retrieve money and deliver it to the woman at the woman's request.

h.   At the end of the interview, law enforcement showed CC1 a photo of SONG.  CC1 positively identified the woman in the photo as the "elder sister," i.e., the woman who directed him to take all of the above actions.

E.   <u>Search of CC1's Cellphone Reveal SONG Directing CC1 and Providing Information About the Victims</u>

31.   Following his interview, CC1 consented to the search of the two cellphones that were seized during his arrest (in addition

14

to the previously obtained state search warrant for those two cellphones).  One of CC1's phones showed communication between CC1 and the user of telephone with the number ending in 8888 ("Subject Telephone"), primarily through electronic messages and photographs. Based on the investigation, I believe that SONG was the person using the Subject Telephone to communicate with CC1.

32.  The search of messages sent between CC1's phone and the Subject Telephone showed numerous communications between August 23, 2023 to February 6, 2024 that appeared to be related to financial transactions that CC1 was making at various bank branch locations, including dozens of messages from the Subject Telephone to CC1 where the user of the Subject Telephone gave CC1 specific directions on when and which bank to go and how much money to be transferred or withdrawn on each occasion.  Below is an example of an exchange between Subject Telephone and CC1 from January 23 to January 24, 2024, where the user of the Subject Telephone directed CC1 to go to PNC Bank in order to resolve an issue relating to an incoming check deposit of $423,000[3]:

| Subject Telephone: | Go To Bank..  Do Verification and Submit Phone no. Tell them this story Ask Banker To Put This Note.  Also Ask Banker that you want to file complaint because how can you call my client and tell them i am fraud?  What did i do wrong?? Can you Tell Me?? |
|---|---|
| Subject Telephone: | Jeff on the cashier's check is the customer's name. |

---

[3] The majority of the text communication between the Subject Phone and CC1 was in simplified Chinese and has been translated to English by a translation service or fluent Mandarin speaking agent.

| | |
|---|---|
| Subject Telephone: | You must tell them just as I've told you, do not say the wrong thing. |
| CC1: | He wants the sender's address |
| CC1: | Where did the money originate from |
| CC1: | Where where does this person live? |
| Subject Telephone: | Who's asking? |
| CC1: | teller |
| Subject Telephone: | You can tell them that this is personal, you don't have the authority to give that information |
| CC1: | She's on the phone and will have to start everything again |
| Subject Telephone: | When everything is done, I'll make sure to give you more |
| Subject Telephone: | I will ask this side for more money to pay you as compensation |
| Subject Telephone: | I have to give props to this bank |

33.  Based on a review of CC1's other bank accounts, law enforcement later located a check in the amount of $423,000 from sender J.C. (first name Jeff), dated December 21, 2023, approximately one month before these texts.  This check had been deposited or attempted to be deposited into a PNC Bank account ending in 3906 ("PNC Account 3906"), for which CC1 was listed as the signatory.  Based on these facts, I believe that this is a discussion between CC1 and the user of the Subject Telephone regarding issues with depositing the check from J.C.

34.  In other electronic messages, Subject Telephone provided CC1 foreign wire transfer instructions.  Below is an example of such messages:

16

| Subject Telephone: | Account name: CENTURY SOFTWARE LIMITED |
|---|---|
| | Account number: [XXXXXX]60091[4] |
| | Bank Name: DBS Bank (Hong Kong) Limited |
| | Bank address: Units 1208-18, Miramar Tower, 132-134 Nathan Road, Tsimshatsui, Kowloon, Hong Kong |
| Subject Telephone: | Tomorrow outgoing 91850, it's better, don't make it whole dollar amount. |
| CC1: | OK |
| Subject Telephone: | did you arrive yet? |
| CC1: | waiting in line |
| Subject Telephone: | If asked what the transfer is for, just say it's for overseas real estate investment |
| CC1: | ok |
| Subject Telephone: | Can you withdrawal cash here? After transferring is finished, withdraw $5,000 |
| CC1: | ok |
| Subject Telephone: | What time will you be here, let's meet first, I can give them the money.  You can keep $1,000. Once everything is done, we can then settle. |

35.  In another message exchange between the Subject Telephone and CC1 on November 10, 2023, CC1 asked the individual using the Subject Telephone how much he should transfer from his Citibank account, and what he should put on the check.  The user of the Subject Telephone instructed CC1 to make the cashier's check payable

_____

[4] The first six digits of the account number in this electronic message have been redacted.

to "Cynthia Song" and that no other information was needed besides this name.  CC1 complied with the request.

36.  Lastly, the review of CC1's communications with the Subject Telephone showed photos of driver's licenses of several victims that were sent from the Subject Telephone to CC1.  Notably, one of these photos between CC1 and the Subject Telephone included the driver's license of Victim L.D., which was sent on September 22, 2023.  In addition, and within the same message thread, the user of the Subject Telephone also sent a photo of a deposit receipt for $100,000 that was deposited into the BofA Account 2820 of Carlson International, which I believe is the $100,000 check that Victim L.D. deposited into BofA Account 2820, as discussed earlier in this affidavit.

F.   Funds Deposited into Accounts Controlled by CC1 Were Wired to Overseas Bank Account Connected to SONG

37.  Law enforcement's review of the multiple accounts at various bank under CC1's control revealed many outgoing foreign wires of funds to a company named NSMG Capital Co., Limited ("NSMG Capital") located in Hong Kong, China.

38.  Law enforcement requested information relating to NSMG Capital from IRS-CI's international office in Hong Kong.  According to IRS-CI's research, NSMG's former director is listed as "Xin Wang."  The name "Xin Wang" is SONG's prior legal name according to U.S. immigration records.  SONG's first U.S. permanent resident ID card was issued in that name.[5]

---

[5] SONG was naturalized as a United States citizen in January 2019, according to immigration records.

39. In addition, review of bank records from CC1's bank account for Carson International LLC, the Citibank Account ending in 7801 ("Citibank Account 7801"), showed one cashier's check payable to SONG for $30,000 on November 10, 2023. This date corresponds to the date when the user of the Subject Telephone instructed CC1 to get a cashier's check made payable to "Cynthia Song" as described above. Bank records showed this check was then deposited into SONG's bank account and the endorsement signature on the back of the check resembles the signature on SONG's California driver license.

G. Further Investigation into SONG Reveals Money Laundering Activity Dating Back to 2021

40. After identifying SONG as a suspected manager of individuals involved in money laundering such as CC1, law enforcement investigated her further through the review of corporate filings and bank records.

41. California Secretary of State filings showed that SONG was the registered agent of multiple entities, including SW Prosperity Real Estate Development LLC, Prosperity Trading Company Inc, Fullsun Bio LLC, and Cannaez LLC.

42. Investigation into SW Prosperity Real Estate Development LLC ("SW Prosperity") revealed that SONG opened a business bank account for SW Prosperity at Bank of America, the account ending in 6838 ("BofA Account 6838").

43. Review of records for BofA Account 6838 revealed the following:

a. SONG opened the account on July 1, 2021 and listed herself as a member of SW Prosperity.

b.    The address listed on the account was 923 Fairview Ave, Arcadia, CA 91007.

c.    Between December 13 to December 19, 2022, four wire transfers totaling $170,850 were deposited into this account.

d.    Once the funds were deposited, the funds were quickly transferred out of the account using Zelle or other electronic payments.  By the end of December 2022, only $1,300.97 of the incoming wire transfers of $170,850 remained in the account.

44.  Two senders of wires deposited into BofA Account 6838 later filed online fraud complaints through the Internet Crime Complaint Center ("IC3") and reported that were tricked into sending these wires via tech support scams.[6]  Specifically, one victim stated he was deceived into sending a total of $82,000 to BofA Account 6838 after he fell victim to someone who purported to be Microsoft who claimed his computer was hacked.  Another victim, Victim C.B., reported to receiving a pop-up on her computer from McAfee Anti-Virus on December 12, 2022.  When Victim C.B. called the number listed on her screen, she was connected to someone who later tricked her into granting access to her laptop and convinced her to log into her bank account.  From there, the scammer led Victim C.B. to believe that Victim C.B. had accidently been processed an overpayment and the victim would need to pay that excess amount back.  The scammer directed Victim C.B. to go to her bank and wire $69,500 to BofA Account 6838, which Victim C.B. did.

---

[6] IC3 is a central hub for reporting cyber-enabled crime run by the FBI.  Victims of online fraud can report frauds via the filing of online reports, akin to online police reports, and law enforcement can access these reports to help combat online crime.

H.   SONG's Connection to Money Laundering with CC2 and CC3

45.   More recently, law enforcement connected SONG to two individuals, CC2 and CC3, who were engaged in a similar pattern of suspected money laundering as CC1.  CC2 and CC3 were subjects of a separate investigation into a large-scale counterfeit electronics trafficking conspiracy.  Evidence from that investigation showed that CC2 and CC3 were associated with SONG and had formed multiple business entities and opened multiple bank accounts in 2023 that then received fraud proceeds from elderly victims.

*CC2'S Suspected Money Laundering*

46.   Review of California Secretary of State records showed that CC2 formed an entity called Prosperity Real Estate Development LLC ("Prosperity Real Estate") on April 10, 2023, and listed himself as the agent at the address of 923 Fairview Avenue, Apt A, Arcadia, CA 91007.  This address was also used by SONG in connection with Charter Communications internet service used to access CC1's bank account, as discussed above.

47.   Two days after the formation of Prosperity Real Estate, CC2 opened Bank of America account ending in 0907 ("BofA Account 0907") in the name of Prosperity Real Estate.  A review of bank records for BofA Account 0907 showed the following:

a.   The account was opened on April 12, 2023 in the name of Prosperity Real Estate at the San Gabriel Financial Center in California.

b.   BofA surveillance footage showed two individuals, one male and one female, visiting the Bank of America branch location in San Gabriel to set up the account on April 12, 2023.  Law enforcement later identified these two individuals as CC2 and SONG

based on the comparison of surveillance footage with their California driver's license photographs.

  c. The address listed for the account was 923 Fairview Avenue, Apartment A, Arcadia, CA 91007.

  d. CC2 was listed as a signatory.

  e. The account received eight wires totaling $594,311.74 in April and May 2023.  All of the wire originators later reported these wires as fraud.

  f. CC2 made four wire transfers of the funds from the account, totaling approximately $443,775, to NSMG Capital.

  48. Law enforcement located a local police report from one of the victims, an elderly woman in Louisiana, who wired money to BofA Account 0907.  That victim, Victim N.C., reported to the Lafourche Parish Sheriff's Office in May 2023 that someone fraudulently induced her to send two wires totaling $146,425.74 to BofA Account 0907.  The victim reported that she was convinced to send money to this bank account after receiving phone calls and text messages from someone purporting to be "special agent Jason Riley of the Social Security Administration."  Among other things, the victim reported that the individual who identified themselves as "Jason Riley" told the victim that her social security number was compromised and the only way to protect the money she had in her bank was to send it to a secure government account until her case could be properly investigated.  Victim N.C. reported doing so and sent the wires at the request of this person.

  49. In addition to the BofA Account 0907 account, law enforcement also found that CC2 opened a separate bank account for Prosperity Real Estate at East West Bank, the account ending in 8974

("EWB Account 8974").  Review of the bank records and IC3 reports associated with this account showed the following:

      a.   CC2 opened the account on April 21, 2023.

      b.   CC2 was the signatory on the account.

      c.   The account received multiple wires and electronic payments starting on May 9, 2023.  East West Bank was then notified by some originating banks to recall these wires and payments due to reported fraud from the senders of these funds.

      d.   Law enforcement found multiple IC3 cybercrime reports filed by victims who reported that they were defrauded into sending money to EWB Account 8974.

50.   Law enforcement also identified a third bank account that CC2 created for Prosperity Real Estate at Citibank, the account ending 1470 ("Citi Account 1479").  Review of the bank records and IC3 reports associated with this account showed the following:

      a.   CC2 opened the account on April 14, 2023.

      b.   The account received multiple suspected wires.

      c.   An IC3 complaint reported that on May 9, 2023, Victim S.D. reported that he was deceived into sending $30,989.45 to this account by someone who purported to be from the Social Security Administration.

      d.   Shortly after receipt of the above-referenced victim funds, $29,129 was transferred to NSMG Capital.

*CC3's Suspected Money Laundering*

51.   Review of California Secretary of State records show that CC3 formed two separate entities in May 2023.  Specifically, Ciberspring International LLC ("Ciberspring") and Oceanpathway Real

Estate LLC ("Oceanpathway") on May 10, 2023 and May 16, 2023, respectively.  Further detail for each entity is provided below.

*Ciberspring Bank Accounts*

52.  Shortly after forming Ciberspring, CC3 opened the following four different bank accounts in Ciberspring's name, including Citibank account ending in 7695 ("Citibank Account 7695"), Bank of America account ending in 0837 ("BofA Account 0837"), JP Morgan Chase account ending in 2211 ("JPMC Account 2211"), and East West Bank account ending in 5974 ("EWB Account 5974").[7]

53.  Review of records for these accounts showed no apparent legitimate business activity other than the suspicious incoming wire transfers.  All of the funds that were received into these accounts were either recalled to the remitting banks due to fraud or withdrawn from the account via wire transfers to NSMG Capital.

54.  According to IC3 reports, three victims reported that they were defrauded into making wire payments to Ciberspring's accounts, specifically, EWB Account 5974 and BofA Account 0837.

*Oceanpathway*

55.  CC3 opened another business bank account for Oceanpathway at Bank of America, account ending in 3461 ("BofA Account 3461"), on May 26, 2023.

56.  A review of bank records and IC3 reports for BofA Account 3461 showed the following:

a.  The account received two wires totaling $166,000 in June 2023.

---

[7] Bank records for each of these accounts show CC3 signing as the signatory on the date of the account opening.

b.    The sender of one of these wires, Victim J.C., filed and IC3 report on June 15, 2023 stating he was deceived into wiring $99,000 to BofA Account 3461.

c.    A substantial portion of the funds received in this account were transferred to NSMG Capital.

I.    Review of CC2's and CC3's Cellphones Show Messages Relating to Money Laundering

57.  On May 30, 2024, federal law enforcement arrested CC2 and CC3 after they were indicted in the Central District of California on federal charges relating to their involvement in a counterfeit electronics conspiracy.  During their arrests, CC2's and CC3's cellphones were seized and later searched pursuant to federal search warrants.  Review of CC2's and CC3's phones revealed numerous WeChat messages between CC2 and CC3, on one hand, and individual believed to be SONG, on the other hand.

58.  For example, CC3's cellphone contained numerous WeChat messages between CC3 and an individual whom CC3 refers to as "Iris," who law enforcement later identified as SONG.  Those chats were translated by a Mandarin Chinese speaking agent and summaries of the chats and other findings from CC3's cellphone are provided below:

a.    In early May 2023, CC3 messaged "Iris" regarding the formation of Ciberspring and Oceanpathway.  In response, "Iris" instructed CC3 to go to Bank of America and East West Bank to open accounts for those entities.

b.    "Iris" provided CC3 with a phone ending in 8889 and the email address of iris.song123456@gmail[.]com to use for the creation of the bank accounts.  The phone number ending in 8889 is

the same phone number associated with SONG's Charter Communications internet service at 923 Fairview Avenue, Apt A, Arcadia, CA 91007.

c.    There were multiple messages where "Iris" sent CC3 images of suspected victims' driver licenses in response to questions stating that banks were asking about the source of the wires that had been deposited into his account.

J.    CC3 Identifies SONG as the Organizer

59.    On May 30, 2024, law enforcement interviewed CC3 after he was arrested.  Agents mirandized CC3 and he agreed to speak with law enforcement.  The interview was recorded and conducted in the Mandarin Chinese language by a Mandarin-speaking agent.  Based on my review of the translation and as well as my discussion with the interviewing agent, below is a summary of CC3's statements regarding his suspected money laundering with SONG:

a.    CC3 stated that CC2 introduced him to the individual he knew as "Iris."  "Iris" asked CC3 to assist with transferring money and told him the money originated from friends and clients who needed help purchasing items in China.

b.    At "Iris's" request, CC3 created Ciberspring and Oceanpathway.  He then transferred money at the direction of "Iris." He said he was paid approximately a couple of hundred to a thousand dollars for each transfer that he helped facilitate.

c.    CC3 was aware that CC2 had also made transfers for "Iris."

60.    In October 2024, CC3 was interviewed in the presence of his defense counsel, law enforcement (including me), and Mandarin

Chinese translator.[8]  I speak Mandarin and we also had the assistance of certified interpreter during the interview.  During the interview, CC3 stated the following:

a.   He referred to the person he knew as "Iris" as "Iris Song."  He also knew her to go to by another name, which he could not immediately recall or pronounce due to his limited English abilities.  The name "Cynthia" was written on a piece of paper and he identified that was the other name he knew her to use.

b.   CC3 stated that he made the relevant transfers at "Iris's" request.

c.   CC3 ultimately acknowledged that he was suspicious that the funds he transferred at the direction of "Iris" were the proceeds of crime or some other form of suspicious activity, but he did it nonetheless because he needed the money.

K.    Law Enforcement Attempts to Locate SONG

61.  CC1's arrest was publicized.  Specifically, SPD issued a press release announcing CC1's arrest on February 9, 2024, and I am aware that local media picked up the story and publicized CC1's arrest based on online searches.

62.  In May 2024, an IRS-CI agent conducted drive-bys at SONG's suspected residence at 121 W. Floral Avenue, Arcadia, California.  On those occasions, the agent did not observe any activity at the location and no lights appeared to be on in the house nor did he observe any cars in the driveway.

---

[8] CC3 has been in custody since his arrest in May 2024 on the federal charges.  CC3 sat for a proffer with the government to cooperate and in the hopes of leniency on his pending federal charges.

63.    Based on the CC1's statement that he was supposed to meet SONG the day of his arrest with money, coupled with the fact that agents did not observe any activity at her suspected residence, agents began to suspect that SONG may left the area.

64.    Shortly thereafter, in late May 2024, CC2's and CC3's arrests on federal charges for their role in a counterfeit electronics conspiracy were also publicized.  Specifically, the U.S. Attorney's Office for the Central District of California issued a press release after the May 30, 2024 arrests of CC2 and CC3.  This story was also picked up by local news media.

65.    Agents also attempted to find SONG using license plate readers to look for the license of her known vehicle.  As discussed above, California DMV records showed that SONG was the registered owner of a black Land Rover with California license plate 9DJH205. This vehicle is the same make and color as identified by CC1 and camera footage received from Bank of America showed SONG and CC2 visiting the San Gabriel branch location on April 12, 2024 in a black SUV vehicle, similar to a Land Rover.  Given the likelihood that this was SONG's actual vehicle, agents used license plate readers in an attempt to locate her.  Agents intermittently ran this license plate through license plate reader databases from April 2024 through July 2024.  Based on license plate reader data, it appeared that SONG's vehicle was in the Las Vegas area during most of April and May 2024.  The vehicle was then observed sometime in early June 2024 en route from Las Vegas to California, however, no further identification of the vehicle plate was observed after this date.

L.    SONG was Arrested Shortly After Returning From Mexico

66.    On Friday, October 25, 2024, around approximately noon, agents received an alert that SONG entered the United States from Mexico at the Calexico port of entry.  In response to the alert, agents immediately contacted Customs and Border Protection ("CBP") who stated that SONG was currently at secondary screening at the port of entry.  CBP reported that SONG was driving a blue 2024 Mercedes GLE 53 AMG coupe with California license plate 9HYD360, and that she was the sole occupant in the car when she crossed the border.  California DMV records showed that this car was registered to a person other than SONG.  According to CBP officers, SONG reported during her secondary screening interview that she was coming to United States to visit a friend who was giving birth soon. SONG departed the port of entry after her secondary screening interview.

67.    At approximately 2:06 p.m., SONG went through U.S. Border Patrol Highway 86 Border Patrol Checkpoint near Westmoreland, California.  She was observed driving through the checkpoint in a blue Mercedes AMG coupe.  This time, however, she had two additional passengers in her car.  U.S. Border Patrol ("USBP") agents conducted immigration checks on the two other individuals in the car.  One of the passengers, Z.X., was determined to be a potential visa overstay.  As part of routine primary inspection, a USBP drug-sniffing dog passed SONG's vehicle and alerted his handler to the presence of contraband.  As result, the car was directed to secondary inspection.  SONG stated the vehicle was hers and gave consent to search the car.  The dog alerted to the car's rear seat. The car was searched but no contraband was found.  Around this time,

HSI contacted USBP to ask that they detain SONG for a probable cause arrest.  Passenger Z.X. was transported to an immigration center for processing.

68.    Later that afternoon, while still being detained at the checkpoint, SONG was placed under arrest.  As part of her arrest, USBP seized the SUBJECT DEVICES referenced in this warrant that were in SONG's purse along with SONG's other personal effects.  At approximately 6:30 p.m., HSI Special Agent Austin Koval advised SONG over telephone that she was under arrest.  Agent Koval spoke to her in English and SONG appeared to understand her rights according to him.  Agent Koval advised SONG of her right to appear before a magistrate judge in Imperial County, within the Southern District of California, or Los Angeles, within the Central District of California.  SONG reported that she preferred to be taken to Los Angeles and appear there.

69.    At approximately 10:45 p.m. that evening, IRS-CI Special Agent Audrey Morehead and I arrived at U.S. Border Patrol Highway 86 Border Patrol Checkpoint to take SONG into custody and transport her back to Los Angeles.  Both Agent Morehead and I are fluent Mandarin speakers.  We spoke to SONG in both Mandarin and English, and we recorded our conversation with her.  SONG appeared to understand us at all times.  We read SONG her Miranda rights in Mandarin Chinese and she signed an advice of rights waiver and orally stated that she understood her rights.  We further advised SONG that she was under arrest for conspiracy to commit money laundering.  We then again explained to her that she would be taken before a magistrate judge and had the option of appearing in a local court or in Los Angeles. SONG confirmed that she wished to be transported to Los Angeles and

appear before a magistrate judge in Los Angeles rather than Imperial County.

70.  Agent Morehead and I then transported SONG to Santa Ana jail, where SONG was booked into custody at approximately 1:45 a.m. in the morning of Saturday, October 26, 2024.

71.  On Saturday, October 26, 2024, Agent Morehead conducted further investigation into passenger Z.X., the visa overstay who was traveling with SONG when she stopped at the border checkpoint. Various records showed that Z.X. was listed as the CEO of a company called Baykul International LLC, which was registered to an address in Rosemead, California, according to California Secretary of State's website.  Agent Morehead later found two IC3 reports filed by victims who report sending money to Baykul International LLC's business bank accounts under fictitious pretenses from someone named "David Freeman," who purported to be a law enforcement officer. Further review of SONG's financial records showed that a Wells Fargo bank account in her name received multiple Zelle payments from bank accounts registered under Baykul International LLC.

## V.  <u>TRAINING AND EXPERIENCE ON MONEY LAUNDERING OFFENSES</u>

72.  Based on my training and experience, as well as information from other investigators, I am aware of the following:

a.  Fraudsters and money launderers and their co-conspirators often maintain books, receipts, notes, ledgers, bank records, and other records relating to the recruitment, enticement, transportation, booking, and financial activity related to fraud and money laundering.  Fraudsters and money launderers also maintain similar records, either physically or electronically, regarding

their receipt of funds for fraud, laundering, and money movement schemes for their illicit proceeds.

b.    Fraudsters and money launderers increasingly use third-party payment applications such as Zelle, Venmo, PayPal, and WeChat Pay operated on digital devices, to transfer funds from financial crime activity to include funds form victims/entities. The previously mentioned records are often maintained where the fraudsters and money launderers or their employees have ready access to them, such as on their cellphones and other digital devices. These items are typically stored in operational locations such as businesses and personal residences where they can maintain oversight and control of the items but may also be on electronic devices.

c.    Communications between co-conspirators of fraud and money laundering, as well as communications between fraudsters and victims or victim entities takes place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cellphones and other digital devices. In addition, it is common for people engaged in fraud and money laundering to have photos and videos on their cellphones or other electronic devices of illicit proceeds, accounts, co-conspirators, and other indicia items, as they frequently send these photos to each other for reference and proof of work.

d.    Fraudsters and money launderers often keep the names, dates of birth, passport information, physical descriptors, addresses, telephone numbers, and financial information of their mules and victims on their digital devices and in their residences. Additionally, they often keep the names, contact information, and financial information of their co-conspirators on their digital

devices and in their residences.  They often keep records of
meetings with associates and victims on their digital devices,
including in the form of calendar entries and location data.

e.    It is common for fraudsters and money launderers to
own multiple phones of varying sophistication and cost as a method
to diversify communications between various customers and suppliers.
These phones range from sophisticated smart phones using digital
communications applications such as Blackberry Messenger, WhatsApp,
and the like, to cheap, simple, and often prepaid flip phones, known
colloquially as "drop phones," for actual voice communications.  It
is common for them to keep these devices on their person or in their
residences.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

73.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

74.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is often
retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained in
the file does not disappear; rather, the data remain on the hard
drive until overwritten by new data, which may only occur after a
long period of time.  Similarly, files viewed on the Internet are
often automatically downloaded into a temporary directory or cache
that are only overwritten as they are replaced with more recently

downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

75.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.  In addition, the SUBJECT DEVICES are likely to contain substantial communications in Mandarin Chinese, which is expected to take a significant amount of time to review.

76.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the

user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CYNTHIA SONG's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CYNTHIA SONG's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

//

## VII.  CONCLUSION

77.  For all the reasons described above, there is probable cause to believe that SONG committed violated 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering).  There is further probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found on the SUBJECT DEVICES, as described in Attachment A.


*/s/ Cassidy Liu*
Jiongwei Cassidy Liu
Special Agent
Homeland Security Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27th day of
October, 2024.

THE HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE